UNITED STATES, Appellee

v

NORMAN W. TIMMINS, First Lieutenant, U. S. Marine Corps, Appellant

21 USCMA 475, 45 CMR 249

No. 24,805

June 30, 1972

*Lieutenant Kenneth N. Beth,* JAGC, USNR, argued the cause for Appellant, Accused.

*Lieutenant Steven C. Cross,* JAGC, USNR, argued the cause for Appellee, United States. With him on the brief was *Commander Michael F. Fasanaro, Jr.,* JAGC, USN.

## Opinion of the Court

DUNCAN, Judge:

Our review of this case calls for a determination of the providency of a plea of guilty to a specification alleging absence without leave from May 15 to September 9, 1970.

Upon examination by the military judge, prior to the acceptance of the plea, the appellant expressed satisfaction with his counsel, and that his plea was a product of his free will. Timmins also stated:

"MJ: During the time from 15 May 1970, until 9 September 1970, your absence from your unit was without authority from anyone competent to grant you leave or liberty. Is this correct?

"ACC: Yes, sir."

In the course of sworn testimony, during the sentencing portion of the proceedings, the appellant disclosed that following his graduation from a university where he participated extensively in sports, he was drafted as a professional baseball player. As a professional he played four seasons before entering the Marine Corps as an officer candidate. Upon completion of Officer Candidate School, he was assigned to Camp Pendleton, California.

Shortly after reporting to Camp Pendleton, the appellant received a change of duty orders to report to Base Special Services for participation on the basketball team. When basketball season was over, about March 2, 1970, he was given orders for temporary duty (TAD) at Marine Corps Recruit Depot (MCRD), San Diego, California, to participate on the baseball team. This season was finished on or about May 13 or 15.

Testifying, the appellant related:

"Q: Now, after 14 May 1970, were you aware that you should have returned to Camp Pendleton?

"A: Well, yes. I didn't know what the procedure was. In the last part of April and the first two weeks of May the Hawaiian Marine's Baseball Team were over from Hawaii, they were touring California and Arizona, and the universities and military installations; at that time, I believe it was the 5th of May, Gunnery Sergeant Al NORTON was coaching and managing the Hawaiian Marine's Baseball Team, and

**476**

their OIC, a Captain, had talked to me about coming over to Hawaii on a change of PCS, permanent change of station, while on TAD status. And they said that they hadn't anticipated any problems in getting myself and two other ball players over there. And so, subsequent to this, I didn't know exactly what the procedure was following the season.

"Q: Following the season did you actually believe that you ultimately would be transferred to Hawaii?

"A: Yes, I did, because there were 16 of us on the baseball team, 13 received orders back to their units, three of us, including myself, did not receive any orders, which made me assume that the orders would be coming back from CMC, sending me to Hawaii.

"Q: Now, subsequent to 14 May, did you continue to reside at Camp Pendleton?

"A: Yes, I did. I was commuting on a daily basis, except, of course, when . . . when the team was on the road for a period of a few days or a week.

"Q: Excuse me, I am referring to the period from 14 May, subsequent to 14 May.

"A: Did I reside at Camp Pendleton? Yes.

"Q: Now, when did you become aware that you were not going to be transferred to Hawaii?

"A: Well, the . . . there was word that, from the Special Services down at San Diego, that everything, the paper work and the procedure, had all been sent through, and that it was favorable that we would be getting a reply sometime in July or August. I did not receive any word subsequent to this that the orders had been refused until the end of August.

"Q: Then the period from 14 May, were you paid?

"A: Yes, I was.

"Q: Where did you pick up your money?

"A: I was paid here at Camp Pendleton, over at Brigade Disbursing.

"Q: After you became aware that you weren't going to return ' . . . excuse me, you weren't going to be transferred to Hawaii, did you return to Camp Pendleton?

"A: Yes, I did. I returned and talked to Colonel McCAIN, at Special Services, and Major PIFEL, in the Brigade Headquarters.

"Q: Now, did you return of your own free will?

"A: Yes, I did."

Nothing was said in the orders about returning at the end of the season and he received no verbal instructions. He again testified that at all times he continued to reside at Camp Pendleton and commuted daily to San Diego.

Near the end of appellant's testimony, the military judge interrupted and the following colloquy took place:

"MJ: Now, as to — I would like to ask, counsel, this is to the first specification.

"DC: Yes, sir.

"MJ: I'm sure you have examined the possibility of a defense of an honest and reasonable mistake of fact as to that Specification?

"DC: Yes, sir.

"MJ: Do you consider it honest and reasonable?

"DC: No, sir."

The responsibility for accepting a plea of guilty is that of the military judge (president of a special court-martial if there is no military judge) and such a plea should be accepted only after a most searching inquiry. United States v Care, 18 USCMA 535, 40 CMR 247 (1969).

Article 45(a), Uniform Code of Military Justice, 10 USC § 845, provides in part:

"If an accused . . . after a plea of guilty sets up matter inconsistent with the plea, . . . a plea of not guilty shall be entered in the record, and the court shall proceed

as though he had pleaded not guilty."

See paragraph 70b, Manual for Courts-Martial, United States, 1969 (Revised edition), which comports generally with Rule 11, Federal Rules of Criminal Procedure. See also United States v Vance, 17 USCMA 444, 446, 38 CMR 242 (1968); United States v Lewis, 18 USCMA 287, 39 CMR 287 (1969); United States v Calpito, 18 USCMA 450, 40 CMR 162 (1969).

This case presents a somewhat similar situation to that found in United States v Farris, 9 USCMA 499, 502, 26 CMR 279 (1958). Farris was a contestant in elimination tryouts for the divisional rifle team. At weekly meetings unsuccessful contestants were advised of their elimination and were instructed to return to their regular organizations. At the last meeting the members of the team were selected and those chosen were issued temporary duty orders and directed to report to the division headquarters company. Farris was informed that he had been eliminated, but he did not appear at his organization until 18 days later when he showed up to draw his pay. He was told that his absence was unauthorized.

Farris testified that during that period he fired with the team and continued to live in the barracks. He had a first class liberty card which permitted him to go on liberty after the day's firing without the necessity of reporting to anyone. He admitted that the final eliminations were announced when they " 'read off a list of names that had been dropped.' " He insisted, however, that his name was not among those read. Asked whether he had received temporary duty orders directing him to Headquarters Company with the other successful contestants, he replied in the negative. But he maintained he had been told by the first sergeant to " 'wait around' " because additional orders would be issued. He continued to fire with the team. His first indication of an unauthorized absentee status was when he reported to receive his pay. A witness verified Farris' residence in the barracks during the time he was allegedly absent and his part-time employer testified that while working for him during this period Farris often spoke of firing with the team. In reversing Farris' conviction, we said:

"It is well-settled that the law officer must submit to the court-martial every issue of fact raised by the evidence. We have held that an honest and reasonable mistake of fact may exonerate an accused from a charge of absence without leave. United States v Holder, 7 USCMA 213, 22 CMR 3 [1956]. The testimony of the accused here raises such an issue. More than denying knowledge that he had been eliminated from the team, he maintained he was told he was to 'wait around' for orders. His testimony is at least partially corroborated by two witnesses. We conclude, therefore, that the issue was raised for the court-martial. The law officer erred to the accused's prejudice in failing to present it to them." [Id., at page 501.]

In the instant case, as indicated by the military judge's interruption of the appellant's testimony, the judge recognized the potential defense of honest and reasonable mistake of fact.

The mandate of Care requires that before accepting a plea of guilty the military judge personally determine, by questioning the accused, whether his "acts or the omissions . . . constitute the offense or offenses to which he is pleading guilty." The case at bar does not involve the propriety of the initial acceptance of the guilty plea. However, when the military judge believes the accused has offered testimony which operates to set up matters inconsistent with his plea, in order to make the determination either to allow the plea to stand or to proceed to trial as if there had not been a guilty plea, the judge has an obligation to discover from the accused his attitude regarding the potential defense. The same reasoning which gave rise to the Care rationale renders in-

adequate the mere asking for defense counsel's conclusion as to whether he considered the mistake of fact honest and reasonable. We also note that the question was phrased in such a manner as to be readily distinguishable from an inquiry as to whether *accused and his counsel* had weighed the evidence and determined that it was inadequate for an effective legal defense. Cf. United States v Hinton, 8 USCMA 39, 23 CMR 263 (1957).

When the appellant's testimony reasonably raised the question of a defense of mistake of fact, it ▮ was incumbent upon the military judge to make a more searching inquiry to determine the accused's position on the apparent inconsistency with his plea of guilty. A prior determination by the defense counsel that "there is a factual basis for the plea . . . will not relieve the military trial judge or the president of his responsibility to do so on the record." *Care,* supra, at page 541. Cf. Article 45(a), Code, supra.

The evidence of record reflects that the appellant at all times during the period of his alleged unau- ▮ thorized absence continued to reside in the Bachelor Officers' Quarters at Camp Pendleton. He regularly obtained his pay at the 5th Marine Amphibious Brigade Disbursing Office. His orders to play baseball contained no direction as to the procedure to be followed when the temporary additional duty terminated. The Special Services' noncommissioned officer in charge testified that Marines assigned to varsity athletics do not actually have any billets; their primary official function is to compete in athletic activities while assigned to this duty. The appellant did not receive orders to report back to his parent unit for further assignment; rather, through conversation with the coach of the Hawaiian Marines' Baseball Team, he expected to receive orders for a permanent change of station to Hawaii. When he learned that the transfer had not been approved, the appellant reported to Brigade Headquarters.

Given its best view, the accused's testimony by no measure establishes his innocence as a matter of law, but is inconsistent with his declaration of guilt to such an extent that the military judge was required to inquire further as we have reasoned hereinabove. We comment on this because Timmins admitted the lack of competent authority granting him leave. Such an admission must be considered, but is not so overwhelming as to prohibit other testimony from giving rise to a potential defense based on reasonable mistake of fact. It is this variety of an accused's personal uncertainty that our prior decisions have attempted to deal with.

The decision of the Court of Military Review affirming the appellant's conviction of the Charge and its specification is reversed. The record of trial is returned to the Judge Advocate General of the Navy. The Court of Military Review may reassess the sentence on the basis of the remaining finding of guilty or a rehearing may be ordered.

Chief Judge DARDEN concurs.

QUINN, Judge (dissenting):

As the majority acknowledge, the plea of guilty was properly accepted on the basis of the accused's personal admission that he was absent without authority. The requirements of United States v Care, 18 USCMA 535, 40 CMR 247 (1969), were thus satisfied. Neither Article 45 of the Code nor the supplementary provisions of paragraph 70 of the Manual for Courts-Martial require personal inquiry of, and personal response by, the accused in regard to the existence of a possible affirmative defense. I am satisfied, therefore, that defense counsel's statement on the matter was sufficient to indicate that the defense had considered and had rejected the possibility of claiming that the accused was mistaken in believing that his absence was without authority of anyone competent to give him permission to remain away. I would, therefore, affirm the decision of the Court of Military Review.